*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF PAUL M. BYRNES, by KRISTEN
D. SEEGERT, Personal Representative, and PAUL
M. BYRNES M.D., P.C.,

      Plaintiffs-Appellees,

v

PROMEDICA HEALTH SYSTEMS, INC. and
LISA LEADER,

      Defendants-Appellants.

UNPUBLISHED
September 5, 2019

No. 343324
Lenawee Circuit Court
LC No. 15-005447-CZ

Before: BECKERING, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

Defendants ProMedica Health Systems, Inc. ("ProMedica"), and Lisa Leader appeal as of right a December 13, 2017 judgment for approximately $1.8 million entered in favor of the late[1] plaintiff Dr. Paul M. Byrnes and plaintiff Paul M. Byrnes, M.D., P.C., following a jury trial. For reasons explained more fully below, we reverse in part and affirm in part.

## I. RELEVANT FACTS AND PROCEEDINGS

This case arises out of the suspension of Dr. Byrnes's privileges to practice medicine at ProMedica Bixby Hospital in Adrian, Michigan ("the hospital"), which is owned by defendant ProMedica. Dr. Byrnes was 63 years old at the time of trial. Before his privileges to practice at the hospital were revoked, he had practiced as an independent obstetrician and gynecologist for

---

[1] Dr. Byrnes died during the pendency of this appeal, after which this Court granted plaintiffs' motion to substitute the personal representative of Byrnes's estate in his stead. *Byrnes v ProMedica Health Systems Inc*, unpublished order of the Court of Appeals, entered March 20, 2019 (Docket No. 343324).

more than 30 years, and he testified that he had planned to continue doing so as long as he was physically able. He feared that if he retired, his "wife would go nuts if [he] was at home all the time." Also, other than his wife, Dr. Byrnes's great "love[]" in life was his work—delivering babies, in particular. According to him, of the six practicing obstetricians in the county where the hospital was located, only the county's two "independent" obstetricians—Dr. Byrnes and "Dr. Smith"—would treat Medicaid patients. The county's other obstetricians, who were all ProMedica employees (i.e., not merely doctors with privileges to *practice* at the hospital), refused to "see" such patients because "[t]hey don't pay as well," are "more work," and "there's more liability."

Dr. Byrnes knew that he could come across as bad-tempered. At trial, he relayed an incident that occurred on July 3, 2014, when he had agreed to cover for another obstetrician, even though he had been up until the small hours of the morning delivering a baby. He was not supposed to begin covering for the other doctor until around 4:00 or 5:00 p.m., but was called in around 11:00 or 11:30 a.m. for three patients who were preparing to give birth. One of those patients, who was "completely dilated" and ready to deliver, was only 20 weeks pregnant, with the baby far too premature to be viable. As Dr. Byrnes put it, in such circumstances "the neonatologist won't come, no need to, we don't do resuscitations on 20-week babies. The baby's eyes were still fused."

As Dr. Byrnes dealt with the two active labors, a third patient in active labor arrived, leaving the obstetrics staff "pretty busy." While Dr. Byrnes was trying to attend to his other patients, a nurse asked him to go speak with "some friends" of the "20-week pregnancy," who wondered why the hospital was not "sending [the patient] to Toledo." After Dr. Byrnes spoke with the friends, he went to attend to another patient, but a nurse informed him that "two other friends" of the woman in premature labor had arrived and were being "quite belligerent" about the decision not to send the woman to Toledo. One of these "friends" informed Dr. Byrnes that her 25-week-old child had been delivered in Toledo, and Dr. Byrnes "tried to explain to that young lady that there's a big difference between 25 weeks and 20 weeks." As the heated discussion continued, Dr. Byrnes admitted that he "rudely" asked the woman how long her 25-week-old infant had lived, and she answered, "28 days." The friend "wasn't happy" with Dr. Byrnes at the time, but later that evening she came and "apologized" to him.

Not long after this incident, in early August 2014, Dr. Byrnes's wife suffered a life-threatening aneurysm. She was taken to the University of Michigan Hospital, where she would remain for approximately four weeks. On August 17, 2014, Dr. Byrnes's wife underwent a 12-hour brain surgery to repair her cerebral aneurysm. After about four weeks of inpatient hospital treatment, Dr. Byrnes's wife was discharged and sent to a nursing facility. At that time, "the bill" for her treatment was $560,000. She did well at the nursing facility "for a couple of weeks," but then "she started to deteriorate," ultimately suffering "a massive stroke" on October 17, 2014, which left her completely paralyzed on one side.

On August 18, 2014, the day after Dr. Byrnes's wife underwent brain surgery, the hospital's chief of staff, Dr. Alan Snider, sent Dr. Byrnes correspondence informing him that the "Disruptive Practitioner Committee (DPC)" had assessed him a "Minor with Merit" reprimand because of "unprofessional behavior on several different occasions on the OB Unit in July and

August 2014." Among other things, the DPC recommended that Dr. Byrnes "seek anger management counseling," "meet with" Dr. Snider "on a monthly basis to review progress and concerns," and participate in presenting continuing education lectures to "the OB nursing staff." However, the correspondence made clear that because it did not impose any "disciplinary" action, Dr. Byrnes was under no compunction to follow its recommendations. Moreover, a hospital employee informed Dr. Byrnes that, in light of his wife's condition, "they were going to postpone [his] disciplinary action" for an unspecified period. He was later informed that the hospital's Medical Executive Committee (MEC) would "readdress" the issue at its regular scheduled meeting on January 14, 2015.

Dr. Byrnes testified that it was important to him to continue working after his wife fell ill because it distracted from his worries about her. For that reason, he had asked other hospital staff to refrain from repeatedly asking about her condition. Nevertheless, some of the doctors did so, including Dr. Suzy Lutz. On the evening in question, Dr. Lutz began asking Dr. Byrnes "20 questions on how [his] wife was doing." Dr. Byrnes "asked her, please let's not talk about this," and when she "wouldn't let it go," he "got angry" and left the medical lounge. Dr. Lutz followed him and continued to pose questions, asking whether his wife was able to speak. When Dr. Byrnes answered that she was not, Dr. Lutz asked, "[H]ow do you communicate with her? And that's when [Dr. Byrnes] got mad." He "started yelling" and "told her, look, I asked you four times to not discuss my wife[.]" Dr. Byrnes subsequently apologized, as did Dr. Lutz, who sent him take-out food later that week.

Several nurses testified that they noticed changes in Dr. Byrnes's demeanor at work that autumn. According to Nurse Jocelyn Gossman, he simply "wasn't himself[.]" "He had personal issues going on and his behavior at work became just difficult to deal with sometimes. He was louder than normal" and "wasn't always the easiest person to work with at that time." Gossman said that during this timeframe, nurses would sometimes refrain from calling Dr. Byrnes about patients, fearing his mercurial temperament, and she felt that this negatively affected the morale of the nursing staff. Also, Gossman "personally didn't always agree with the way" that Dr. Byrnes treated patients during this timeframe, although she could not recall a specific instance.

Similarly, the unit manager of the OB nursing department, Angela Dawn Ford, indicated that during the autumn of 2014, Dr. Byrnes "just seemed a little more on edge" and "really kind of wound up." He "would kind of have an outburst about something and" the nurses would "see him kind of pacing back and forth[.]" He also "definitely" displayed "more anger," less of a sense of humor, was "more aggressive in his language," and had trouble moderating his volume. At some point that fall, Ford recalled a "very loud" disagreement that occurred between Dr. Byrnes and a patient. Although Ford was "not sure on the details," she recalled that there was "yelling," "a lot of colorful language," "a lot of emotion," and that the patient and the patient's family were "upset" afterward.

Nurse Coralia "Corie" , who is a friend of Gossman's outside of work, admitted that she and Dr. Byrnes were not "getting--g along very well" in the months preceding the incidents at

issue in this case.[2] Indeed, a few weeks before the initial suspension of Dr. Byrnes's privileges, he asked that Walworth not be assigned to assist with any of his patients. Walworth testified that it seemed as if Dr. Byrnes had been going through "an emotional unraveling[.]" Walworth testified that on December 31, 2014, the same evening Dr. Byrnes became upset with Dr. Lutz, she was in a patient's room when Gossman knocked on the door and asked to speak with Walworth. When Walworth stepped out, Gossman said, "I want you to stay away from the nurse's station. Don't come out." Walworth gave her a quizzical look, and Gossman continued, "Dr. Byrnes is coming to the unit and I don't want him to hurt you or kill you." Gossman explained, "No, really, I just—I don't want there to be a problem. I don't want you to be harmed."[3]

On the evening of January 13, 2015, a nurse staff meeting was held, which was attended by about half (16 out of 31) of the obstetrics nurses. At approximately 12:16 a.m. on the morning of January 14, 2015, defendant Lisa Leader, a "nurse manager" employed at the hospital, sent an e-mail to the hospital's "chief nursing officer," Kathy Greenlee, the vice president of medical affairs, Dr. Raymond Gagliardi, and the chief of obstetrics, Dr. Victor Cherfan, in which Leader wrote:

> I wanted to timely share some concerns received from the OB nurses at our staff meeting tonight. I did not realize the full extent of the turmoil that Dr. Byrnes is creating in the OB environment. He is escalating with his "ranting." Many staff voiced concern for their safety when he goes into these tirades. I have nurses expressing fear that he is going to come in and shoot them. There are a few nurses that he has a particular disdain for that feel they may be targeted. Unbeknown to me, until tonight, on 12/31 he was ranting and raving so obnoxiously at the desk regarding a nurse that another one of the staff went to the room where this nurse was at, pulled her aside and told her not to come to the desk until he left as she was concerned he would kill her. I am not trying to feed any drama but I am worried. His behavior is tearing the unit apart & there is little faith from nursing that administration is fully listening. I have assured them that their concerns are being listened to and that he is & will be dealt with but unfortunately their trust has waned as they see him getting worse instead of better. I realize that details of any discipline may not be able to be shared but would love it if you could stop by the unit and acknowledge that their worries and concerns

---

[2] Nurse Diana Mason-Six described Dr. Byrnes and Walworth as being "like oil and water." Walworth was "a very intelligent young lady," who "sometimes questions people," and Dr. Byrnes did not care for her personality or demeanor. Despite Gossman's admitted friendship with Walworth, she acknowledged that Walworth "has a history of doing things" that doctors, including doctors other than Dr. Byrnes, "don't necessarily agree with[.]"

[3] Gossman's testimony concerning December 31, 2014, coincides with Walworth's on all material points, except Gossman did not indicate that she ever said anything about Dr. Byrnes *physically harming* Walworth.

-4-

have been heard and are being taken seriously. I also shared with one of the nurses, who is particularly frightened she will be targeted, that we can bring a Security Guard in if necessary (Kathy – I know we had talked about this before so felt comfortable offering).

Thanks in advance, for listening and intervening.

Lisa

Later that morning, Dr. Gagliardi, who is a "nonvoting member" of the MEC, received the e-mail and forwarded it to Kathy Raines, marking its importance as "[h]igh." Dr. Gagliardi testified that he and the rest of the MEC viewed Leader's e-mail as "a very serious allegation," posing "an immediate emergency[.]" They "were very worried [that Dr. Byrnes] was having a complete breakdown" and might go "postal." Accordingly, the MEC summarily suspended his privileges on the same day that Leader's e-mail was received, but only for a limited duration of 14 days. The suspension was pursuant to Medical Staff Bylaws, Art IX, § 3.1, which mandates "immediate action . . .to prevent immediate danger to life, or substantial likelihood of injury or damage to the health or safety" of those present at the hospital. Further, Dr. Snider, the hospital's chief of staff, testified via video deposition that Leader's e-mail "led to the various stream of actions that occurred after."

Later that same day, Gagliardi and Timothy Jakacki, president of the hospital, provided written notification to Byrnes of his summary suspension, and that it was effective immediately. Gagliardi testified that in a subsequent telephone call with Dr. Byrnes, he put forth the MEC's proposal that Byrnes submit to counseling, but Byrnes was "screaming" and using "bad language[.]" Gagliardi said he conveyed more details to Byrnes at a face-to-face meeting, explaining that ProMedica would arrange for a counselor who works with ProMedica employees to come from Toledo, Ohio, to Adrian, and would cover the cost of counseling. According to Gagliardi, Byrnes was "[e]xtraordinarily agitated, not just upset," and addressed a "barrage of vulgarities" at Gagliardi. Although Gagliardi has "a fair amount of experience . . . dealing with severe emotions," he said that Byrnes's demeanor "scared" him. Gagliardi did not testify about Byrnes's alleged conduct at the later "fair hearing," which formed the basis for the MEC's decision to permanently suspend Dr. Byrnes's privileges.

In his account of his dealings with Gagliardi, Byrnes stressed how little specific information he received regarding the reason for his suspension, and that the "sticking point" between him and the MEC was the latter's insistence that he take a voluntary leave of absence of unspecified duration. According to Dr. Byrnes's knowledge, no other physician had ever been summarily suspended in this fashion for any offense. He said that when he asked why he was being suspended, he was informed "that the nurses were afraid for their lives." When he asked which nurses were afraid, he was denied any answer. Dr. Byrnes testified that he volunteered to, and in fact did, go to counseling, but was informed that that was insufficient. Rather, the hospital wanted him to take a three- or four-month "voluntary" leave of absence, during which he would receive counseling. However, Dr. Byrnes stated that he knew that even after taking such a leave, there would be no guarantee that he would be permitted to return to work at the hospital, let alone within a specific timeframe. Moreover, he "couldn't afford to take a leave of absence," and thus he declined to do so. Dr. Gagliardi confirmed that he responded to Dr.

Byrnes's financial concerns about the proposed leave of absence by stating, "I don't think you can afford not to do this because if you don't, they're going to make your temporary suspension permanent." Dr. Gagliardi also confirmed that no particular timeframe was ever provided concerning the length of the proposed leave of absence.

On January 27, 2015 (or 13 days after the hospital summarily suspended Dr. Byrnes's privileges), it mailed him a notice that the MEC had "sustained the summary suspension" and "recommended that a professional review action be commenced[.]" Dr. Byrnes was informed that he was entitled to request a hearing, and he subsequently did so on February 13, 2015.

Ultimately, however, following a two-day hearing in April 2015, presided over by retired Ohio trial judge Richard W. Knepper, a panel of three physicians selected by the hospital decided that the MEC had met "its burden of establishing the basis for their [sic] action," while Dr. Byrnes "did not . . . establish by clear and convincing evidence that the adverse action lacked any substantial basis or that such basis, or conclusions drawn therefrom were arbitrary, capricious or unreasonable." The three-physician panel recommended that the MEC, "with a quorum, . . . meet face-to-face" with Dr. Byrnes to provide him "the opportunity to air [his] side" before contemplating "summary dismissal." On the basis of "information . . . that was not available to" the MEC when it summarily suspended Dr. Byrnes, the hearing panel further recommended that he "be given a chance to remediate" with the understanding that his privileges would be permanently terminated if he failed to comply with the necessary conditions.

Knepper acknowledged that at the two-day hearing, Dr. Byrnes was not permitted to call Nurse Jamie Nichols as a witness in his favor. Moreover, according to Dr. Byrnes, he was not informed of the witnesses, evidence, or nature of the allegations against him "until just before" the hearing.

On June 11, 2015, the MEC announced its decision, accepting the panel's "findings" but rejecting its recommendations, including the recommendation that Dr. Byrnes be given a chance for remediation. Hence, his privileges at the hospital were permanently suspended.

The original plaintiffs filed a complaint on October 28, 2015. Plaintiffs' eventual theory of the case was that (1) the allegations in Leader's e-mail were defamatory, (2) they were made with malice, i.e., with knowledge that they were false or with reckless disregard as to truth or falsity, (3) the hospital's administration used those false allegations as a pretext to summarily suspend Dr. Byrnes's privileges at the hospital, (4) they did so without reasonably investigating the allegations or providing Dr. Byrnes a fair opportunity to refute the allegations, (5) which constituted tortious interference with his business expectancies (preventing his future delivery of babies at the hospital), and (6) also constituted a breach of contractual obligations set forth in the hospital's "medical staff bylaws." Defendants argued primarily that federal and state statutes provided immunity from damages for activities related to peer review actions, and that they had fulfilled the criteria entitling them to such immunity.

The parties proceeded to trial on September 5, 2017. On the fourth day of a five-day trial, after both sides had presented their cases, defendants moved for a directed verdict on all counts. Defendants argued that the bylaws did not establish a contractual relationship,

ProMedica was entitled to immunity under federal law and Leader was entitled to immunity under state law or to a qualified privilege under common law, and plaintiffs had presented no evidence of defamation against ProMedica. Agreeing with defendants' latter argument, the trial court granted their motion for a directed verdict as to the defamation charge against ProMedica, but denied their motion as to all other counts. The following day, the jury returned a special verdict form, unanimously finding defendant ProMedica liable for breach of contract and tortious interference with a business expectancy, and defendant Leader liable for defamation, rejecting defendants' immunity and privilege defenses, and awarding plaintiffs total future damages for all claims of approximately $1.8 million. Subsequently, defendants filed a motion for a new trial or a JNOV, and a motion for remittitur, both of which the trial court denied. This appeal followed.

## II. ANALYSIS

## A. GREAT WEIGHT OF THE EVIDENCE

Defendants assert that the trial court abused its discretion by denying their motion for a new trial on the ground that a number of the jury's findings were against the great weight of the evidence.

### 1. STANDARD OF REVIEW

A new trial may be granted, on some or all of the issues, if a verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e). We review the trial court's denial of a motion for a new trial for an abuse of discretion. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 196; 600 NW2d 129 (1999). "This Court and the trial court should not substitute their judgment for that of the jury unless the record reveals that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003) superseded on other grounds by MCL 600.2919a. "Determining whether a verdict is against the great weight of the evidence requires review of the whole body of proofs. The issue usually involves matters of credibility or circumstantial evidence, but if there is conflicting evidence, the question of credibility ordinarily should be left for the factfinder." *Dawe v Dr Reuvan Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010). "[A] jury's verdict should not be set aside if there is competent evidence to support it." *Id*. Competent evidence is evidence that is admissible and relevant on the point in issue. See *Nemet v Friedland*, 273 Mich 692, 694-695; 263 NW2d 889 (1935); *Whitaker v Erie Shooting Club*, 102 Mich 454, 459-460; 60 NW 983 (1894).

### 2. IMMUNITY UNDER FEDERAL LAW

Defendants first argue that the jury's finding that ProMedica's actions were not in furtherance of quality health care, thus precluding immunity under the Health Care Quality Improvement Act (HCQIA), 42 USC 11101 *et seq.*, was against the great weight of the evidence.

Congress enacted the HCQIA in 1986 in response "to a crisis in the monitoring of health care professionals." *Singh v Blue Cross/Blue Shield of Massachusetts, Inc*, 308 F3d 25, 31 (CA 1, 2002). As the First Circuit Court of Appeals explained in *Singh*:

Although state licensing boards had long monitored the conduct and competence of their own health care workers, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 USC § 11101(1). Finding that incompetent physicians find it all to[o] easy to move to different hospitals or states and continue their practices in these new locations, Congress mandated the creation of a national database that recorded incidents of malpractice and that was available for all health care entities to review when screening potential employees. Before passage of the HCQIA in 1986, threats of antitrust action and other lawsuits often deterred health care entities from conducting effective peer review. In order to encourage the type of peer review that would expose incompetent physicians, the HCQIA shields health care entities and individual physicians from liability for damages for actions performed in the course of monitoring the competence of health care personnel. [*Id*. (quotation marks and citations omitted).]

For immunity to attach,

a peer review action must be taken--

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence. [42 USC 11112(a).]

The HCQIA creates "a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendant's actions did not comply with the relevant standards." *Meyers v Columbia/HCA Healthcare Corp*, 341 F3d 461, 467-468 (CA 6, 2003). All four sections of § 11112(a) are objective standards, which look to the totality of the circumstances. *Singh*, 308 F3d at 32 (quotation marks and citation omitted).

The jury in the present case found that ProMedica's actions were not "made in the reasonable belief that the actions were in furtherance of quality health care." Defendants

contend that the only evidence supporting this finding was testimony from relief nurse Diana Mason-Six that, according to the rumor mill, ProMedica wanted to get rid of Dr. Byrnes because it was having a difficult time managing his outbursts and did not like his "outspoken personality" and critique of ProMedica. Defendants further contend that the trial court erred by not striking this testimony as inadmissible hearsay. We reject both arguments.

We first turn to defendants' hearsay argument. Hearsay, an out-of-court statement offered into evidence to prove the truth of matter asserted, MRE 801(c), is generally inadmissible absent a specific exception, MRE 802. However, "[i]t is well accepted that evidence that demonstrates an individual's state of mind will not be precluded by the hearsay rule." *People v Ortiz*, 249 Mich App 297, 309; 642 NW2d 417 (2001).

> Wherever an utterance is offered [into] evidence [for] the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned. [*Id*., quoting 6 Wigmore, Evidence (Chadbourn rev), § 1789, p 314 (emphasis and alterations in *Ortiz*).]

Plaintiffs argued that Mason-Six's testimony was "not going to the truth of the matter asserted, but rather "to what was the common thought at the time," "[w]hich goes towards damages, which goes towards the motive." We agree. Mason-Six's testimony that she had heard rumors that the hospital wanted to get rid of Dr. Byrnes served as circumstantial evidence concerning Leader's state of mind. From the testimony that Mason-Six—a part-time "relief" nurse—had heard such rumors, the jury might have reasonably inferred that Leader—a full-time nurse manager—had also heard them. The jury might have further inferred that those rumors influenced Leader's decision to send the subject e-mail, thereby providing management a means of terminating Dr. Byrnes's privileges and simultaneously ridding Leader of a doctor with whom members of her nursing staff had been at odds. Such inferences regarding Leader's state of mind were certainly relevant to the defamation claim against her, tending to suggest that she sent the e-mail knowing its contents to be false or with reckless disregard for whether they were true. In light of these considerations, we cannot say that the trial court abused its discretion by admitting the evidence in question for this limited purpose.

We also reject defendants' assertion that, excluding Mason-Six's rumor testimony, the great weight of the evidence was against the jury's finding that ProMedica's actions against Dr. Byrnes were not taken in an objectively reasonable belief that they were in the furtherance of quality health care. If believed by the jury, Dr. Byrnes's testimony established that he was one of only two "independent" obstetricians in the county, that all of the other obstetricians who practiced at the hospital were ProMedica employees, and that none of those ProMedica obstetricians would treat Medicaid patients because, at least in part, doing so was less profitable than treating patients with private medical insurance. Dr. Gagliardi testified to the contrary that the hospital prides itself on having a mix of staff physicians and independent physicians, and that Byrnes's status as an independent physician never came up in the MEC's discussions. Leaving the question of credibility for the factfinder, *Dawe*, 289 Mich App at 401, the jury could have ascribed an economic motivation to ProMedica's actions.

Further, while several members of the hospital staff testified that Dr. Byrnes had engaged in inappropriate or unprofessional behaviors, others described Dr. Byrnes glowingly as a "very professional," "great doctor," with a "great bedside manner," who was passionate about obstetrics, "loved" by his patients, "provide[d] wonderful care," would sleep at the hospital when his patients were experiencing difficult labor, "always treated" the nurses "with respect," and "wouldn't hurt a flea." It was the jury's sole prerogative to assess the credibility and weight of such testimony. See *Taylor v Mobley*, 279 Mich App 309, 314; 760 NW2d 234 (2008) ("the jurors' prerogative to disbelieve testimony, including uncontroverted testimony, is well established."). The jury was also free to credit the testimony that other doctors who practiced at the hospital had displayed anger toward nurses in the past—to the point of making the nursing staff feel "uneasy"—but had not been summarily suspended like Dr. Byrnes.

Likewise, it was the role of the jury to assess the credibility of the explanations of Dr. Byrnes and Dr. Gagliardi regarding what happened after Dr. Byrnes's summary suspension. Dr. Gagliardi testified that the members of the MEC "very much wanted to help" Dr. Byrnes, and nearly "every single member" considered him to be a friend. On the other hand, Dr. Byrne's testimony suggests that he was blindsided with the summary suspension, kept largely in the dark about the specific accusations against him, and presented with demands unworkable in light of his circumstances. It was the jury's sole prerogative to credit or discredit each witness' testimony, as it deemed appropriate and reasonable. *Id*.

Given such evidence, and drawing credibility judgments in favor of the jury's verdict, a rational juror could reasonably infer that ProMedica's decisions to summarily suspend Dr. Byrnes's privileges and to later make that suspension permanent—by rejecting the "fair hearing" panel's remediation recommendation—were not made in the objectively *reasonable* belief that doing so was in the furtherance of quality health care. Based on that finding alone, ProMedica was unentitled to immunity under the HCQIA. See 42 USC 11111(a)(1) (providing immunity when the "professional review action . . . meets *all* the standards specified in section 11112(a)") (emphasis added). In light of the foregoing, we do not conclude that the jury's finding that ProMedica was not entitled to the immunity protection provided by the HCQIA was against the great weight of the evidence.

### 3. IMMUNITY UNDER STATE LAW

Defendants also argue that the jury's finding that Lisa Leader is not entitled to immunity under MCL 331.531(3) because she acted with malice is against the great weight of the evidence. They contend that the record establishes that plaintiffs did not present evidence that Leader's statement, "I have nurses expressing fear that he is going to come in and shoot them" was made with malice. Defendants further argue that the allegations in Leader's e-mail regarding Dr. Byrne's behavior were at least substantially true. We again disagree.

"Peer review is essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a sine qua non of adequate hospital care." *Feyz v Mercy Mem Hosp*, 475 Mich 663, 680; 719 NW2d 1 (2006) (quotation marks and citations omitted). To incentivize hospital staff to provide their frank assessment in such proceedings, Michigan's Legislature has enacted measures "to protect peer review activities

from intrusive public involvement and from litigation." *Id*. These protections are set forth in MCL 331.531, which, in pertinent part, immunizes a person from civil and criminal liability for "provid[ing] to a review entity information or data relating to the physical or psychological condition of a person . . . or the qualifications, competence, or performance of a health care provider." MCL 331.531(1), (3)(a). However, immunity from liability "does not apply to a person, organization, or entity that acts with malice." MCL 331.531(4). The question at issue is whether Leader acted with malice when she sent the January 14, 2015 e-mail purporting to relay certain nurses' concerns that Dr. Byrnes posed a threat to their physical safety.

The meaning of malice applicable to MCL 331.531(4) is the defamation definition of actual malice. *Feyz*, 475 Mich at 684-685. Thus, for purposes of MCL 331.531(4), "malice exists when a person supplying information or data to a peer review entity does so with knowledge of its falsity or with reckless disregard of its truth or falsity." *Feyz*, 475 Mich at 690. "Malice is an exception to peer review immunity." *Id*. at 678 n 45. "Once a defendant has stated sufficient facts constituting peer review immunity, MCR 2.111(F)(3), a plaintiff has to put forward sufficient evidence of malice to invoke the exception to immunity." *Id*.

Plaintiffs argued in the trial court that Leader knew that what she reported in the e-mail was not true because she was at the meeting she purported to describe in the communication and "[n]ot a single person said anything like this." The testimony of several of the nurses who attended the meeting support plaintiffs' position. Jamie Nichols testified that she recalled no conversation at the meeting of the type described by Leader's email. Likewise, Paula Ulrich testified that she did not remember any nurses at the staff meeting raising those concerns expressed in the e-mail, and said that nothing about the e-mail rang true to her. Joselyn Gossman also testified that, although nurses expressed their concern and frustration with Dr. Byrnes's behavior, she did not hear anyone voice any worries about violence or shootings. Walworth also said that many nurses expressed discomfort because they thought they could not discuss patient care with Dr. Byrnes, but she did not recall anyone expressing concerns for their physical safety. Sandra Ash testified that there were general expressions of concern about Dr. Byrnes as a person, but she did not hear anyone at the meeting say they were afraid he was going to come onto the unit and shoot or kill someone. On the other hand, Nurse Angela Ford, manager of the OB unit, testified that she was at the meeting and there was some discussion linking Dr. Byrnes with safety concerns. She remembered that one of the nurses, she did not know whom, said she was afraid Dr. Byrnes was "going to go off and, you know, take people out."

Defendants argue that Leader based the contents of her e-mail not just on comments from the nurses' staff meeting, but also on other conversations she had had with nurses Cheryl Brown, Gossman, and Walworth outside of the meeting. However, in the text of the e-mail, Leader states that she wanted "to timely share some concerns received from the OB nurses at our staff meeting tonight[,]" thus clearly communicating that the information she was about to share was fresh and urgent, arising from the January 13, 2015 meeting. Leader testified that Gossman and Walworth spoke to her after the meeting. However, Gossman testified that she did not recall being part of any post-meeting discussion with Leader, and Walworth said she thought she met with Leader after the staff meeting, but she could only suppose that they discussed the ongoing tension on the OB unit and hoped someone would address it. Leader also testified that Cheryl Brown told her on several occasions, "One day he's going to walk off the elevator and shoot one

of us: Me, you, or Corie." Brown initially testified that she did not remember making any such statement to Leader. However, a portion of her fair hearing testimony shows that she did recall making the statement, but insisted that she made it once, not multiple times.

In tacit recognition that the record evidence supports a reasonable inference that some of the allegations in Leader's disputed e-mail were untrue, defendants rely on the "substantial truth doctrine," which arises from common-law libel principles. See *In re Chmura*, 464 Mich 58, 74; 626 NW2d 876 (2001). The substantial truth doctrine holds that,

> [a]s long as "the substance, the gist, the sting" of the communication is true, minor inaccuracies do not amount to falsity. *Masson* [*v New Yorker Magazine, Inc*, 501 US 496, 517; 111 S Ct 2419; 115 L Ed 2d 447 (1991)]. In other words, the communication "is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id*. [*Chmura*, 464 Mich at 74.]

"[S]ubstantial truth is an absolute defense to a defamation claim." *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 33; 627 NW2d 5 (2001).

Defendants provide no authority for the proposition that this common-law defamation defense applies in the context of the statutory immunity provided by MCL 331.531, nor has our research uncovered any such authority. Assuming without deciding that a defendant may avoid MCL 331.531(4)'s malice exception if the defendant's peer-review communications were substantially true—even if they were made with reckless disregard as to truth or falsity—such is not the case here.

Testimonial evidence suggests that the "gist" or "sting" of Leader's January 14, 2015 e-mail was to imply the existence of an immediate threat arising from possibility that Dr. Byrnes was on the verge of committing a workplace shooting. Leader expressly acknowledged her intent to convey such a threat when she testified that she had perceived "shooting" statements by other nurses not as hyperbole or humor but as literal statements of fear. She said, "the words 'he may shoot someone,' or 'will shoot someone,' " or "shooting" are ones that she "wouldn't really throw around especially in this day and age." She also implied in her e-mail that the fear of imminent physical harm was widespread, reporting that she had "nurses"—plural—"expressing fear that [Dr. Byrnes was] going to come in and shoot them," that there were "a few nurses" who felt that they would "be targeted." Leader further implied that action was needed to meet the threat, writing that she had spoken with one of the concerned nurses about having security guards brought in "if necessary" to protect the nurse, and ending the e-mail with, "Thanks, in advance, for listening and for intervening." In today's society, the gist of this communication was not, as defendants assert on appeal, a request for ProMedica to take action to control Dr. Byrnes's "volatile behavior[.]" Rather, the gist—and certainly the "sting"—of Leader's email was, as Dr. Gagliardi recognized, that Dr. Byrnes might go "postal" and that the hospital's timely intervention was required to prevent a potential workplace shooting.

The trial testimony of various nurses does not support the concern that Dr. Byrnes posed a threat to their physical safety. As already indicated, numerous nurses who either recalled

attending the December 13, 2015 staff meeting or believed that they had attended it testified that they recalled no discussion of safety concerns at that meeting, let alone any safety concerns specifically related to Dr. Byrnes. Moreover, of the numerous testifying nurses, not one acknowledged that she was ever actually fearful that Dr. Byrnes might physically harm her. On the contrary, many of the nurses scoffed at that suggestion, with their testimony generally portraying the doctor as a man who was—if sometimes demanding, profane, and prone to verbal outbursts, especially after his wife fell ill—physically harmless nonetheless.

In light of such conflicting evidence, a rational juror might have concluded that Leader made the "shooting" allegations in her e-mail with knowledge that they were false or with reckless disregard concerning their falsity, hoping that those allegations would prompt a quick response against Dr. Byrnes by the hospital. Again, it was the province of the jury to weigh issues of credibility. *Taylor*, 279 Mich App at 314. On this record, we cannot say that the testimony presented to the jury so preponderates against the jury's finding that Leader was not entitled to peer review immunity that a miscarriage of just would occur if we allow to stand that jury's finding that the allegations in Leader's e-mail were made with malice for purposes of MCL 331.531(4). See *Campbell*, 257 Mich App at 193.

## 4. TORTIOUS INTERFERENCE

Defendants next argue that the jury's verdict concerning tortious interference is against the great weight of the evidence. They contend that the only evidence that could possibly have supported the jury's verdict as to this claim was Mason-Six's inadmissible "rumor mill" testimony. Aside from that, defendants argue, plaintiffs presented no evidence at trial that ProMedica's purpose for suspending Dr. Byrnes was other than the furtherance of quality healthcare, that ProMedica acted primarily to interfere with Dr. Byrnes's relationship with his patients, or that defendants committed a wrongful act.

To establish tortious interference with a business relationship or expectancy, a plaintiff must show: "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Cedroni Ass'n, Inc v Tomblinson, Harburn Assoc, Architects & Planners Inc*, 492 Mich 40, 45; 821 NW2d 1 (2012) (quotation marks and citation omitted). "To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification." *Dalley v Dykema Gossett*, 287 Mich App 296, 323; 788 NW2d 679 (2010). "To establish that a defendant's conduct lacked justification and showed malice, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Id*. at 324 (quotation marks and citation omitted). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id*.

Defendants do not dispute the jury's findings that plaintiffs had "a business relationship or expectancy" with patients, that posed "a reasonable likelihood of future economic benefit for plaintiffs. Nor do they dispute that ProMedica knew about this relationship. Contested is the

jury's findings that ProMedica interfered with plaintiffs' business expectancy intentionally and improperly (i.e., not for legitimate business reasons). Largely for the reasons discussed in our analysis of ProMedica's entitlement to immunity under the HCQIA, we are unpersuaded. Again, it was the jury's prerogative to assess matters of witness credibility. See *Taylor*, 279 Mich App 314. In light of the conflicting testimony about what happened and why it happened, it is possible that the jury credited the circumstantial evidence tending to suggest that the hospital administration permanently suspended Dr. Byrnes's practice privileges for improper reasons, rather than following the hearing panel's remediation recommendation. In particular, the jury could have reasonably inferred that the hospital administration did so both without justification and for the improper purpose of increasing profits, both by eliminating a non-ProMedica doctor who accepted Medicaid patients and by annexing his existing patients in the geographical area for ProMedica-employed physicians. Therefore, viewing the evidence in the light most favorable to the jury's verdict concerning intentional interference with a business expectancy, we conclude that it is not against the great weight of the evidence.

## B. BREACH OF CONTRACT

Defendants next contend that the trial court erred by failing to rule, as a matter of law, that the hospital staff bylaws were not contractually enforceable. Defendants contend that it is settled Michigan law that medical staff bylaws are not a binding contract; because they do not involve the exchange of legally cognizable consideration.

Whether a contract exists is generally a question of law. *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006), citing *Bandit Indus, Inc v Hobbs Intern, Inc*, 463 Mich 504, 511; 620 NW2d 531 (2001). "It is axiomatic that courts decide questions of law and juries apply the law given them to the facts as they have found them." *Krohn v Home-Owners Ins Co*, 490 Mich 145, 172; 802 NW2d 281 (2011).

In the present case, the trial court charged the jury with the task of deciding whether a contract existed between Dr. Byrnes and ProMedica, specifically instructing it to decide whether the essential elements for creation of an enforceable contract had been satisfied. By so ruling, the trial court erred. Even so, reversal is warranted only if the trial court's error was not harmless, i.e., if the error was outcome determinative. See MCR 2.613(A). Thus, if the medical staff bylaws are contractually enforceable, as a matter of law, then the trial court's error was harmless. If not, then the trial court's error led to a verdict against ProMedica for a breach-of-contract claim that the court never should have placed before the jury.

In their briefs on appeal, the parties recognize that the instant contractual issue involves both a split of authority and what appears to be a question of first impression.[4] See generally *Brintley v St Mary Mercy Hosp*, 904 F Supp 2d 699, 721 (ED Mich, 2012) (noting the national split of authority about whether hospital staff bylaws may be enforced contractually and the lack

---

[4] Arguably, this is not a question of first impression, but the application of well-established rules of contract formation to the specific medical bylaws at issue here.

of binding Michigan precedent).[5]  The dearth of binding authority in this area is ostensibly attributable to the fact that before *Feyz*, 475 Mich at 674-676, this Court observed the "judicial nonintervention doctrine," which was "a judicially created common-law doctrine providing that courts w[ould] not intervene in a private hospital's staffing decisions."  Moreover, since our Supreme Court repudiated the nonintervention doctrine in *Feyz* in 2006, no published Michigan decision has addressed the question now at bar: whether hospital staff bylaws may form the basis of enforceable contractual rights in Michigan.

The Sixth Circuit—applying Michigan state law—recently addressed the issue in an unpublished decision, *Bhan v Battle Creek Health Sys*, 579 Fed Appx 438, 448-449 (CA 6, 2014), and held "that Medical Staff Bylaws do not create a contractual relationship in Michigan." The Appeals Court based its reasoning on the lack of specific language in the Medical Staff Bylaws indicating that the defendant hospitals intended the Bylaws to constitute a contract, the lack of legally sufficient consideration, and the fact that the hospitals' boards retained ultimate authority, which the appellate court reasoned further signified a lack of intent to be bound contractually. *Id*. at 448.  Although the *Bhan* decision is not binding on this Court, we do find its reasoning persuasive.  See *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 360; 597 NW2d 250 (1999) ("Though not binding on this Court, federal precedent is generally considered highly persuasive when it addresses analogous issues.").

Following the reasoning of the Sixth Circuit, we hold that determining whether medical staff bylaws give rise to a contractual relationship requires analysis of the bylaws to determine whether they contain the elements of a valid contract.  "[T]he essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v Leja*, 187 Mich App 418, 422; 468 NW2d 58 (1991).  In the medical staff bylaws at issue, we find no language indicating ProMedica's intent to be bound contractually.  It is true that Article XIII, § 3.5 of the bylaws states, "These Bylaws . . . shall replace and supersede all previous Bylaws . . . and be binding upon the Board, the Medical Staff, the Hospital and all third parties, including applicants for Medical Staff membership."  However, that same section also notes, "[a]ll amendments must be approved by the Board," and only "become effective on the date of Board approval." Additionally, in relevant part, Article II of the bylaws provides:

---

[5] In *El-Khalil v Oakwood Healthcare Inc*, ___ Mich ___, ___; ___ NW2d ___ (2019) (Docket No. 157846) [COA Docket No. 329986], slip op at 11-12, our Supreme Court held that a plaintiff physician alleging a breach of hospital staff bylaws had "sufficiently pleaded a claim for breach of contract" to survive summary disposition under MCR 2.116(C)(8) (failure to state an actionable claim).  The issue before the Court was whether factual allegations also required supporting evidence to be able to survive a summary disposition motion brought pursuant to MCR 2.116(C)(8).  The parties did not raise the legal issue of the contractual enforceability of hospital bylaws in the Supreme Court, although it had been raised and decided in the *trial* court. Thus, our Supreme Court did not directly address this legal issue, and its decision in *El-Khalil* does not provide any dispositive holding for purposes of this analysis.

Therefore, these Bylaws and the Medical Staff Rules and Regulations and Policies are created to set forth principles, requirements, and procedures within which the physicians, dentists, and podiatrists shall carry out the responsibilities delegated to the Medical Staff in a professional and collegial manner, as an integral component of the Hospital, *subject to the ultimate authority of the Board of Trustees*. [Emphasis added.]

Likewise, Article X, § 7.8 unambiguously provides that the board is entitled to entirely disregard the MEC's recommendations following professional review proceedings and appeals, thereby rendering all of the promises to the staff concerning the process to be afforded in such proceedings meaningless.[6] Where bylaws unambiguously reserve final authority to one entity, it strains logic to argue that that entity intended the bylaws to bind it contractually.[7] See *Bhan*, 579 Fed Appx at 448.

Also lacking is the legal consideration required for contract formation. "Consideration exists when there is 'a benefit on one side, or a detriment suffered, or service done on the other.'" *Yoches v City of Dearborn*, 320 Mich App 461, 480; 904 NW2d (2017), quoting *Sands Appliance Servs*, 463 Mich 231, 242; 615 NW2d 241 (2000) (quotation marks and citation omitted). Michigan law requires the owner, operator, and governing body of a hospital to assure that all physicians admitted to practice in the hospital are organized into a medical staff, MCL 333.21513(d), and requires the hospital's board to "adopt bylaws, rules, and policies governing the operation and professional work of the hospital and the eligibility and qualifications of its medical staff," MCL 331.6(2). In addition, seemingly anyone or anything on a hospital's

---

[6] In pertinent part, Article X, § 7.8 provides:

Final Decision of the Board. Within thirty (30) days after receipt of the appellate review body's recommendation, the Board shall reach its decision. If this decision is contrary to the MEC's last recommendation, the Board shall refer the matter to an ad hoc committee comprised of three (3) Members of the Active Medical Staff selected by the Chief of Staff, and three (3) Board members selected by the Board Chairman, prior to issuing notice of its final decision. This committee shall make its recommendation to the Board within fifteen (15) days. *The Board* shall then make its *final* decision. The Board's final decision shall be immediately effective, *and the matter shall not be subject to any further referral or review*. [Emphasis added.]

[7] Article III of the bylaws concerns "Medical Staff Membership." Section 11 of that article addresses the appointment, reappointment, and expiration or termination of privileges of "Contract Practitioners." The section also indicates that a contract practitioner whose privileges are terminated pursuant to a contract or employment agreement has no right to a hearing or to appellate review as provided by the bylaws, including those in Article X. The effect of this subsection is to indicate further the intent that something more than the bylaws is necessary to establish a contractual relationship between the hospital and the members of the medical staff.

premises "shall be subject to the bylaws, rules, and polices as the hospital board may adopt or authorize to be adopted." MCL 331.6(2).[8] "Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise." *Yerkovich v AAA*, 461 Mich 732, 740-41; 610 NW2d 542 (2000). Where state law requires the hospital to organize doctors into a medical staff and to issue bylaws to govern the medical staff, and requires physicians on the hospital's premises to abide by the bylaws, one finds no evidence of a bargained-for exchange. Although there might conceivably be a set of circumstances under which medical staff bylaws would be contractually enforceable, given the absence of legal consideration requisite for contract formation, those circumstances are not presently at bar.[9]

Because the medical staff bylaws are not contractually enforceable as a matter of law, the trial court's error was not harmless. Accordingly, we reverse with regard to the breach-of-contract claim. Because plaintiffs remain entitled to the same damages award based on their tortious interference of business expectations theory, the judgment remains valid.

## C. DAMAGES

Defendants contend that plaintiffs offered no competent testimony as to future damages because the testimony of plaintiffs' expert, Robin Wheaton, did not meet Michigan's standards for expert testimony and the trial court should have stricken it. Defendants argue accordingly that the trial court erred by failing to grant their motion for a JNOV as to the jury's future damages award. We review a trial court's decision whether to strike expert testimony for an abuse of discretion. *Bercel Garages, Inc v Macomb Co Rd Comm*, 190 Mich App 73, 84; 475 NW2d 840 (1991). "We review de novo a trial court's decision to deny a motion for JNOV." *Freed v Salas*, 286 Mich App 300, 322; 780 NW2d 844 (2009).

The standard for expert testimony set forth in MRE 702 provides:

---

[8] MCL 331.6(2) states in relevant part: "Physicians, nurses, attendants, employees, patients, and persons approaching or on the premises of the hospital and furniture, equipment, and other articles used or brought on the premises shall be subject to the bylaws, rules, and policies as the hospital board may adopt or authorize to be adopted."

[9] Nevertheless, a hospital's bylaws are judicially enforceable, even if not enforceable as contracts. The HCQIA provides immunity from damages, not from lawsuits; plaintiffs may seek equitable relief, such as the reinstatement of privileges. See, e.g., *Milford v People's Comm Hosp Auth*, 4 Mich App 142; 144 NW2d 687 (1966) (holding that the plaintiff physician could not be charged with violating bylaws that lacked legally sufficient standards for restricting privileges of staff physicians); *Singh*, 308 F3d at 44-45 (where the plaintiff sought reinstatement as a primary care provider); see also Hsu, *Contracts: A Question of Consideration: Medical Staff Bylaws as an Enforceable Contract – Medical Staff of Avera Marshall Regional Medical Center v Avera Marshall*, 42 Mitchell Hamline L Rev, 387, 416 n 35 (2016) (identifying some jurisdictions that consider medical staff bylaws judicially enforceable, though not enforceable as contracts).

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, trial courts have "an independent obligation to review *all* expert opinion testimony in order to ensure that the opinion testimony satisfie[s] the three . . . preconditions noted above[.]" *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "While a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention,[10] the court *must* evaluate expert testimony under MRE 702 once that issue is raised." *Id*.

At trial, plaintiffs called "accredited business accountant" Wheaton, who was then serving as "the president of the Michigan Tax and Accounting Professionals in Lansing," and had nearly 40 years of professional experience in accounting. Wheaton or other members of his accounting firm had prepared Dr. Byrnes's tax returns for approximately 25 years. Wheaton prepared a report, which the trial court admitted into evidence over defendants' repeated objections, in which Wheaton projected Dr. Byrnes's future economic damages as 15 years of future earnings at a rate of $152,663 annually (i.e., a projected total of approximately $2.29 million). Defendants did not object to Wheaton's qualifications as an expert, but to the factual basis of his report and the principles and methods he used to arrive at the report's conclusions.

After defendants objected, thereby bringing the trial court's gatekeeping obligations to its attention, the court nevertheless failed to analyze meaningfully whether Wheaton's expert opinions satisfied the preconditions of MRE 702. In other words, the trial court abdicated its discretion to decide this evidentiary issue. "Such abdication constitutes an abuse of discretion." *Berry v Garrett*, 316 Mich App 37, 50; 890 NW2d 882 (2016). Even so, reversal is not required. MRE 103(a); MCR 2.613(A).

Defendants' instant claim of evidentiary error is ultimately self-defeating, inasmuch as defendants tacitly acknowledge that the error was harmless. See MRE 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); MCR 2.613(A). In general, an error is not harmless if it was outcome-determinative, *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017), or "it

---

[10] The record does not support plaintiffs' contention that defendants failed to preserve this issue by objecting to Wheaton's testimony. Defendants raised the instant grounds for JNOV below, objected at the outset of Wheaton's testimony that plaintiffs had failed to establish a sufficient "foundation" for admission of Wheaton's report, were refused their requested opportunity to voir dire Wheaton concerning his report before it was admitted, and later moved to strike the report as expressing improper expert opinions under MRE 702. Thus, this issue is preserved.

significantly interfered with the jury's ability to decide the case intelligently, fairly, and impartially," *Ward v Consol Rail Corp*, 472 Mich 77, 87; 693 NW2d 366 (2005) (quotation marks and citations omitted).

As defendants acknowledge in their brief on appeal, Wheaton's testimony "was little more than a verbal demonstrative exhibit," essentially walking the jurors through simple arithmetic and multiplication that they might have performed on their own, and which plaintiffs' counsel could have walked them through during closing arguments in any event. Moreover, under cross-examination, Wheaton candidly admitted that his projections of Dr. Byrnes's future economic damages were not "based upon any economic science," that he had simply based his projection that the 63-year old Dr. Byrnes would work for another 15 years on plaintiffs' explicit instructions for him to use that timeframe, that he could only speculate as to why Dr. Byrnes's annual income had fluctuated in past years and how it might do so in the future, that he was unaware whether Dr. Byrnes planned to secure employment elsewhere (thereby remediating his damages), and that he simply arrived at the ultimate estimate of future damages in his report by multiplying the five-year average of Dr. Byrnes's income against the "expected" timeframe of 15 years.

In our view, Wheaton's admissions under cross-examination dissipated any prejudice that defendants might have suffered from the improper admission of his "expert" opinion concerning future economic losses. Wheaton's admissions made plain to the jury that his "expert" opinion warranted little or no weight. Moreover, Wheaton's purported opinion that Dr. Byrnes would have worked for another 15 years was cumulative of Dr. Byrnes's own testimony that had his practice privileges not been terminated, he would have worked at least another 15 years so long as he was physically able to do so. Furthermore, the jury did not follow Wheaton's projection of 15 years of future earnings at a rate of $152,663 annually (i.e., a projected total of approximately $2.29 million). Rather, as damages for all claims—including the defamation claim against Leader—the jury awarded future damages for a period covering approximately nine years and three months, awarding Dr. Byrnes $38,000 for the approximately three months that then remained in 2017, $151,000 for 2018, and then slightly less than 1.5% more each subsequent year through 2026, for total future damages of approximately $1.46 million. The fact that the jury's ultimate award of future economic damages deviated downward so markedly from Wheaton's projections suggests that the jury discounted his opinion, arriving at their own estimate of damages. Therefore, we conclude that the trial court's abuse of discretion regarding this evidentiary issue does not warrant reversal.

We turn next to defendants' assertion that the trial court erred in not granting their motion for JNOV as to the jury's future damages award. "A trial court should grant a motion for JNOV only when there was insufficient evidence presented to create an issue for the jury." *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor, and Merrill, Inc*, 267 Mich App 625, 644; 705 NW2d 549 (2005). When performing its de novo review of a trial court's ruling concerning JNOV, this Court "review[s] the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

As a special panel of this Court observed in *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96-97; 706 NW2d 843 (2005):

> The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action. A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable. Damages, however, are not speculative simply because they cannot be ascertained with mathematical precision. Although the result may only be an approximation, it is sufficient if a reasonable basis for computation exists. Moreover, the law will not demand that a plaintiff show a higher degree of certainty than the nature of the case permits. Thus, when the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount. Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question. Questions regarding what damages may be reasonably anticipated are issues better left to the trier of fact.

In light of the fact that Dr. Byrnes is now deceased, it is highly tempting, with the benefit of hindsight, to second-guess the jury's findings regarding future damages. However, at the time of trial, the jury was tasked with arriving at an estimate of future damages based on what it *then* knew. As Dr. Byrnes's death demonstrates, because the future is inherently uncertain, and it is impossible to accurately predict what *might* have happened had past events transpired differently, future damages can never be proven or even estimated with any true degree of certainty. Instead, they represent the ultimate "open question," and one about which a jury's educated guess, based on common sense and collective life experience, seems just as likely to be accurate as the statically formed forecasts of an actuary. See *Tiffany v Christman Co*, 93 Mich App 267, 281; 287 NW2d 199 (1979) ("Any prediction regarding future losses is inherently speculative. Underlying such a prediction are assumptions regarding wage trends and work life expectancy that are not susceptible to precise estimation.").

In this instance, the jury was presented with information concerning the past 15 years of Dr. Byrnes's practice income, testimony concerning his expectations about how long he would have continued working at the hospital had his privileges to do so not been revoked, and the opportunity to assess his vitality based on his in-court appearance and conduct during the trial. They were also presented with his testimony that, immediately before his privileges were suspended, his "business was starting to pick back up." In our view, through the presentation of such evidence, plaintiffs afforded the jury evidence that was sufficient under the circumstances to reach as reasonably principled a finding concerning future economic damages as practicable. Thus, we conclude that the trial court did not err by denying defendants' motion for JNOV regarding the jury's award of future economic damages.

## D. LIABILITY

Defendants assert that the trial court erred by holding Leader jointly and severally liable for all of the damages awarded to plaintiffs because her e-mail played no role in the MEC's decision to suspend Dr. Byrnes's hospital privileges permanently. The principles of joint and several liability allow multiple tortfeasors to be held liable as long as their tortious conduct produced a single, indivisible injury. See *Watts v Smith*, 375 Mich 120, 125; 134 NW2d 194 (1965).[11] Here, the jury found ProMedica liable for tortious interference with a business expectancy and Leader liable for defamation, both of which led to the revocation of Dr. Byrnes's hospital privileges and resulting economic damages. Defendants raise three arguments for why the trial court should not have held Leader jointly and severally liable with ProMedica for Dr. Byrnes's injury.

Defendants first argue that Leader's e-mail played a small role in Dr. Byrnes's summary suspension. We disagree. The MEC suspended Dr. Byrnes within hours of Leader's sending her e-mail, Dr. Gagliardi testified that he and the rest of the MEC viewed Leader's e-mail as "a very serious allegation," posing "an immediate emergency" and raising concerns that Dr. Byrnes might go "postal." In addition, the MEC summarily suspended Dr. Byrnes pursuant to Bylaws Art. IX, § 3.1, triggered only where there is "immediate danger to life, or substantial likelihood of injury or damage to the health or safety" of those present at the hospital. Further, Dr. Snider, the hospital's chief of staff, testified via video deposition that Leader's e-mail "led to the various stream of actions that occurred after." On this record, we cannot agree that Leader's e-mail played but a minor role in Dr. Byrnes's summary suspension.

Defendants next argue that even if Leader's e-mail played "some small role in the initial suspension," the MEC did not base its January 22, 2015 decision to continue the suspension on her e-mail, but upon Dr. Byrnes's history and his communications with Dr. Gagliardi and Mr. Jakacki after the summary suspension. However, evidence presented at trial shows that the accusations in Leader's e-mail formed the context for communications with Dr. Byrnes after his summary suspension and before his suspension was made permanent. Dr. Byrnes testified that at the January 14, 2015 meeting with Dr. Gagliardi and Mr. Jakacki, he was informed that he was being suspended because "nurses were afraid for their lives." In addition, the written notice of his suspension made clear that he was being suspended for behavior that "poses an immediate danger to life, or substantial likelihood of injury or damages to the health or safety" of persons in present at the hospital. Witnesses testified to Dr. Byrnes's loudness, his occasional use of profanity, his outspokenness, and the fact that he could be difficult to get along with. However, there is no evidence that anyone thought Dr. Byrnes posed an immediate threat to anyone's

---

[11] The tort-reform statutes abolished joint and several liability in certain tort actions seeking damages for personal injury, property damage, or wrongful death. See, e.g., MCL 600.2956. However, these statutes do not apply here, where personal injury, property damage, or wrongful death are not at issue. Where the Legislature has retained joint and several liability, common-law principles apply. See *Velez v Tuma*, 492 Mich 1, 16; 81 NW2d 432 (2012); *Kaiser v Allen*, 480 Mich 31, 37; 746 NW2d 92 (2008).

health or safety prior to Leader's e-mail, the contents of which the MEC uncritically accepted and acted in accordance with in subsequent communications with Dr. Byrnes. Thus, not only did Leader's e-mail play a crucial role in Dr. Byrnes's summary suspension, its contents continued to provide the context for the extension of that suspension.

Finally, defendants contend that limiting Leader's damages is sound public policy. In support of this argument, defendants refer to this Court's decision in *Wilson v Sparrow Health Sys*, 290 Mich App 149, 153; 799 NW2d 224 (2010). In *Wilson*, a health club member, whom police arrested and charged for indecent exposure after the health club reported the results of its internal investigation, sued the club for negligence and defamation once someone else confessed to the incident and the police dropped the charges against him. This Court held that the defendants could not be held liable as a matter of law because the independent investigation conducted by the police "constituted a superseding cause of the . . . alleged injuries[.]" *Wilson*, 290 Mich App at 153. This Court further observed that "[t]o impose legal responsibility on these citizens for the later, independent decisions of law enforcement officials would unduly restrict the citizens' ability to discharge their legal rights and duties to report criminal wrongdoing." *Id*. at 154. Based on our reasoning in *Wilson*, defendants argue, "if an employee who comes forward is exposed to open-ended liability for damages based on a peer-review committee's ultimate decision after the committee's independent investigation of facts, employees would have strong disincentives to speak up at all." Defendants' argument is unpersuasive.

The present case is distinguished from *Wilson* by the fact that, here, the jury found Leader liable for defamation. See *id*. at 155 (affirming the dismissal of the member's defamation claim against the defendants because at the time the defendants made the alleged defamatory statement, i.e., that Wilson was the "prime suspect," it was true). In addition, the MEC's "investigation" consisted of conversations between Dr. Gagliardi and Dr. Byrnes, with the former attempting to convince Dr. Byrnes to seek counseling. No evidence was presented at trial that the investigation involved attempts to ascertain the truth or falsity of Leader's allegations that Dr. Byrnes's conduct put nurses in fear for their lives.

In light of the foregoing, we conclude that defendants are not entitled to relief from the trial court's holding that Leader is jointly and severally liable for all of the damages suffered by Dr. Byrnes.

III. CONCLUSION

Based in significant part on its credibility assessments of the witnesses' conflicting testimony, the jury concluded that the evidence preponderated against the presumptions of immunity afforded by the HCQIA and MCL 331.531(3). Such credibility decisions fall within the jury's purview. *Dawe*, 289 Mich App at 401. The jury then found ProMedica liable for tortious interference with a business expectancy and found Leader liable for defamation. Competent evidence supports the jury's verdict regarding these two counts. See *Nemet*, 273 Mich at 694-695. In addition, our review of the record leads us to conclude that the evidence does not weigh so heavily against the jury's verdict regarding these two counts that it would be a miscarriage to allow it to stand. *Campbell*, 257 Mich App at 193. Therefore, we affirm the jury's verdict against defendants with regard to tortious interference and defamation. However,

we conclude that the trial court erred in submitting to the jury the question of whether the medical bylaws established contractual relations between ProMedica and Dr. Byrnes, and that the error was not harmless. Accordingly, we reverse the jury's finding that the medical bylaws constitute a contract and its related finding that ProMedica is liable for breach of contract. Nevertheless, we need not disturb the judgment because the other theories of liability continue to support the jury's award of damages. Finally, for the reasons stated above, we conclude that the trial court did not err in holding Leader jointly and severally liable for plaintiffs' damages.

Reversed in part, affirmed in part.


/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Thomas C. Cameron